IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **INDIA SPELLMAN** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 23-3342** |
| **v.** | : | |
| | : | |
| **FORMER DET. JAMES PITTS,** *et al.* | : | |
| | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                                    MAY 9, 2024

## MEMORANDUM OPINION

**INTRODUCTION**

  Imagine spending over a decade in prison for a crime that you knew you did not commit. That is what Plaintiff India Spellman ("Plaintiff") alleges she endured for twelve years, four months, and three weeks, commencing when she was just seventeen years old, after police officers allegedly coerced her and a fourteen-year-old boy into signing fabricated statements that implicated her in a robbery and murder case. Recognizing that she cannot get those years of her life back, Plaintiff now seeks damages under 42 U.S.C. § 1983 ("1983") from the City of Philadelphia and various members of the Philadelphia Police Department for their violations of her rights under the Fourth and Fourteenth Amendments of the United States Constitution.[1] Specifically, Plaintiff alleges, *inter alia*, that members of the Philadelphia Police Department maliciously prosecuted her when they initiated criminal proceedings against her based solely on what they knew was fabricated evidence, and that the City of Philadelphia facilitated such

---

[1]   In her amended complaint, Plaintiff names the following defendants: James Pitts, Ohmarr Jenkins, Henry Glenn, Philip Riehl, the City of Philadelphia, and Police Captain/Lieutenant/Sergeant John Does 1-5. This Memorandum Opinion addresses *only* the claims asserted against Defendants City of Philadelphia, Ohmarr Jenkins and Henry Glenn.

misconduct by failing to properly train, discipline, or supervise these and other members of the Philadelphia Police Department.

Before this Court are the motion to dismiss filed by Defendants City of Philadelphia ("the City"), Ohmarr Jenkins ("Defendant Jenkins"), and Henry Glenn's ("Defendant Glenn") (collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), (ECF 12), and Plaintiff's response in opposition, (ECF 15).[2]  The issues presented in the motion are fully briefed and, therefore, ripe for disposition.  For the reasons set forth herein, Defendants' motion to dismiss is granted, *in part*, and denied, *in part*.

**BACKGROUND**

When ruling on a motion to dismiss, this Court must accept as true the well-pleaded allegations in the complaint.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  The relevant facts are summarized as follows:

> ***Facts Relevant to Plaintiff's Claims Against the Individual Defendants***
>
> In her complaint, Plaintiff asserts that on August 18, 2010, at approximately 3:48 p.m., Philadelphia police were called to 7901 Pickering Street, Philadelphia, Pennsylvania, where a man had been robbed and killed.  The perpetrators of the murder were unknown, and an investigation ensued.  At that same time, Plaintiff (then a seventeen-year-old high school senior) was at her home located at 938 Slocum Street, Philadelphia, Pennsylvania, with her father and grandfather, talking with her friends on the phone and browsing Facebook on the computer.
>
> During the course of the investigation, the police believed that there were two suspects:  a male and a female.  Witnesses described the female suspect as "dark-skinned, heavy-set, size 18, 180 [pounds], age 25-30, and wearing dark, full-length Muslim garments."
>
> Two days later, a fourteen-year-old male named Von Combs ("Combs") was turned in to the police by his mother as being the male suspect.  Combs's mother told police that Plaintiff was the female suspect they were seeking.  As a "skinny, light-skinned," seventeen-year-old who "never wore Muslim garments as

---

[2]   This Court has also considered the Defendants' reply.  (ECF 16).

she was not Muslim," Plaintiff asserts that she did not match the physical description of the female suspect.[3]

Defendant Lieutenant Philip Riehl ("Defendant Riehl") assigned Defendant Glenn as the lead detective of the homicide investigation and ordered Defendants James Pitts ("Defendant Pitts"), Jenkins, and Glenn to interrogate Plaintiff and Combs.

That same day, Plaintiff came home from work and began getting ready to go to the mall. While getting ready, Plaintiff's grandfather told her to come downstairs where she was confronted by multiple police officers and detectives. The police officers asked Plaintiff if she knew the reason for their visit to which she replied that she "had no idea why they were there." The police officers then told Plaintiff's father and grandfather that they were taking her to the police station for questioning.

According to Plaintiff, she was never told that she was under arrest. She believed she was merely going to the police station to answer questions. Despite this belief, Plaintiff was placed in handcuffs and transported in a police vehicle to the Homicide Division of a Philadelphia police station. Plaintiff's father was not allowed to travel in the police vehicle with her. Instead, Plaintiff's mother, father, and grandmother drove themselves to the police station.

At the police station, Plaintiff was placed in an interrogation room where she sat alone for hours. At some point, Defendant Glenn, the lead detective, entered the interrogation room and asked Plaintiff if she knew why she was there, to which she again responded that she did not. Defendant Glenn repeatedly called Plaintiff "a liar" and told her that "she knew what she was there for." Defendant Glenn began screaming at Plaintiff while Plaintiff cried and begged for her parents, who were waiting at the police station. The police refused to let Plaintiff out of the interrogation room and did not allow her mother or father in the room. After repeatedly yelling at Plaintiff and calling her a liar, Defendant Glenn left the room.

A few minutes later, Defendant Pitts entered the room. Defendant Pitts struck Plaintiff in the mouth and called her a liar. He then accused Plaintiff of robbing and killing a man, to which Plaintiff replied that "she did not know what he was talking about." Plaintiff repeatedly begged Defendant Pitts to let her go to her parents. He lied and told her that her parents had already gone home.

Meanwhile, after Plaintiff had already been questioned for hours, Defendant Jenkins attempted to have Plaintiff's mother sign a written consent form to question Plaintiff. Plaintiff's mother refused to sign the form. Plaintiff's father was not

---

[3] Plaintiff alleges that Combs's mother, "the person who first alerted police to her son's possible involvement in the crime, was the same size, skin tone, and age of the female suspect, and she regularly wore full-length Muslim garments." (Am. Compl., ECF 9, at ¶ 25).

asked for permission for his daughter to be questioned outside of his presence. Plaintiff's mother and grandmother were told to wait in the lobby until someone came to get them. Despite Plaintiff's mother's repeated attempts to see Plaintiff, Defendants Pitts, Jenkins, and Glenn prevented her from doing so. At 5:00 p.m., Defendants Glenn and Jenkins told Plaintiff's parents that Plaintiff had confessed to the murder.

Contrary to what Defendants Glenn and Jenkins told Plaintiff's parents, Defendant Pitts fabricated a statement, purporting to have been made by Plaintiff, that implicated Plaintiff and Combs in the murder. Defendant Pitts then repeatedly screamed at Plaintiff and demanded that she sign the false statement written by Defendant Pitts. Defendant Pitts told her that if she signed the statement, she could go home. Feeling hopeless that she would not be able to see her parents or leave the room, and despite Defendant Pitts not allowing her to read the statement, Plaintiff signed the statement sometime after 6:00 p.m.

On that same day, while in custody, Defendant Pitts told Combs that Plaintiff was in custody as the female suspect in the homicide investigation and that Plaintiff had implicated Combs in the robbery and murder. Defendant Pitts stated, "[I]f you don't give us a story, we can't help you." Defendant Pitts came up with lines for Combs to repeat. Defendant Pitts then drafted another fabricated statement which implicated Plaintiff in the murder, handed it to Combs, and told him that if he signed the statement, he could go home to his mother. Combs signed the statement.[4]

Relying on the two fabricated, signed statements, Plaintiff contends that Defendants Pitts, Jenkins, and Glenn initiated criminal proceedings against her. Days later, Combs wrote a letter to Plaintiff apologizing for signing the statement that falsely implicated her in the crimes. Plaintiff gave the letter to her attorney.

As the investigation progressed, the police identified an eyewitness, Kathy Mathis, who testified that she saw someone running from the scene of the murder. A month after the murder, as the preliminary hearing date was approaching, Mathis told the District Attorney's Office that she did not see the perpetrator's face. This conversation was memorialized in a phone call memorandum maintained in the District Attorney's Office's file. This memorandum was never turned over to Plaintiff's defense counsel.

Plaintiff went to trial in February 2013. The Commonwealth subpoenaed Mathis to testify. Prior to taking the witness stand, Mathis told Assistant District Attorney Thomas Lipscomb ("Lipscomb") that she could not identify the female perpetrator. In response, Lipscomb pointed to the defense table and said, "She will be sitting right there next to her lawyer." The Commonwealth later called Mathis

---

[4] Plaintiff alleges that Combs was subsequently charged for robbery and murder. (Am. Compl., ECF 9, at ¶ 52). Combs's case was transferred to juvenile court where he was adjudicated delinquent and sentenced to two years in a juvenile placement facility. (*Id.*).

to the stand and asked her to identify whether Plaintiff was the female perpetrator. Mathis pointed at Plaintiff and identified her as having been at the scene of the crime.

Over the course of the trial, the jury never heard from Plaintiff's father or grandfather, her alibi witnesses, with whom she was at home at the time of the murder. The jury also did not hear from the friend Plaintiff was talking with on the phone during the time of the murder nor were they shown Plaintiff's phone records. In addition, Plaintiff's attorney never introduced the letter from Combs. On February 20, 2013, a jury found Plaintiff guilty of second-degree murder, robbery, and other related offenses.

Plaintiff appealed her conviction under the Pennsylvania Post-Conviction Relief Act ("PCRA"). The Commonwealth agreed that Plaintiff's conviction should be overturned and also noted that "it was troubled by the fact that Comb's mother, the person who alerted police to her son's possible involvement in the underlying crimes and the person who named Plaintiff, the skinny, light-skinned girl who did not match any witness descriptions as Combs's conspirator, was herself a positive match for the actual physical description of the female robbery suspect." (Am. Compl., ECF 9, at ¶ 73). On February 9, 2023, the PCRA Court ruled that Plaintiff's trial was unconstitutional due to misconduct by the prosecution and Defendant Pitts, and ordered a new trial. The prosecution *nolle prossed* all charges and the case against Plaintiff was dismissed the same day. When Plaintiff was released from custody, she had spent twelve years, four months, and three weeks in prison for crimes of which she was wrongly convicted.

### *Facts Related to Plaintiff's Monell Claims*

In 1996, Defendant Pitts became a Philadelphia Police Officer. That same year, the Internal Accountability Office (the "IAO") was formed pursuant to the terms of a settlement between the City and various public interest groups, and designed to "minimize and deter police corruption and misconduct to the greatest extent possible, and thereby enhance public confidence in the integrity of its police force." In 1999, Defendant Pitts was promoted to detective.

In March of 2001, the IAO released a report which "identified serious failings in the disciplinary system" of the Philadelphia Police Department (the "PPD"). In response to the report, the then Mayor formed the Task Force on Police Discipline to investigate the failings. In 2001, the Task Force issued findings which concluded that the disciplinary system in place was woefully inadequate and in need of an overhaul. According to the Task Force, the current system "did nothing to ensure that officers who committed infractions were actually disciplined, trained or counseled in any meaningful way."

On January 18, 2002, Defendant Pitts physically assaulted his wife by punching her in the stomach in their Philadelphia apartment, and caused her to fall to the floor. When responding Philadelphia police officers arrived, Defendant Pitts

told them that his wife hit him first and injured his face. The officers did not see any injuries to Defendant Pitts' face and told him to stay with them. Instead, Defendant Pitts went to the bathroom numerous times and injured himself. In October 2002, Internal Affairs detectives questioned him about the incident with his wife. He lied and told the detectives that his wife had struck him in the face. Internal Affairs referred the case to the District Attorney's Office to file criminal charges against Defendant Pitts for assault and lying to investigators. The District Attorney's Office declined to prosecute Defendant Pitts and the PPD did not fire him.[5]

In 2003, the IAO released a subsequent report regarding its investigation into whether the PPD had done anything to address the 2001 IAO report and the Task Force report. In this 2003 report, the IAO found that the PPD made two minor changes to its disciplinary system which did not address any of the serious concerns previously reported. The 2003 report concluded that the PPD was "simply not interested in achieving true reform." In 2005, the Police Commissioner, Sylvester Johnson, with the backing of then Mayor John Street, publicly attacked the IAO before shutting it down.

In 2006, Defendant Pitts became a homicide detective in the Homicide Division of the PPD. In 2006, Defendant Pitts fabricated and forced a minor to sign a statement which implicated an innocent man in the commission of a crime. To coerce the minor to sign the statement, Defendant Pitts isolated the minor in handcuffs in a room alone with the lights turned off for hours and slammed the minor's head into the table. The innocent man implicated in the fabricated statement was subsequently exonerated after serving thirteen years in prison.

In 2008, Defendant Pitts and other detectives threatened a deaf man and coerced him into signing a false statement by slamming his head into a wall. That same year, Defendant Pitts and other detectives coerced a fifteen-year-old minor, into signing a false statement accusing his cousin of murder, by holding him in an interrogation room without access to his parents for three days, only allowing him to use the bathroom once in three days, telling him his cousin said he did it, and threatening him. In 2011, another minor testified at a preliminary hearing that Detective Jenkins, along with another detective, took him from juvenile court to the homicide unit in handcuffs and interrogated him for at least eight hours before coercing him into signing a fabricated statement.[6]

In 2014, the Police Board of Inquiry found Defendant Pitts not guilty for unlawfully detaining a man for three days in 2013 without legal justification. The

---

[5]     Plaintiff alleges that the District Attorney's Office and PPD failed to hand over the 2002 complaint "to defense counsel in dozens of homicide cases" including her own. (Am. Compl., ECF 9, at ¶ 78).

[6]     Plaintiff alleges numerous instances of misconduct done by police officers throughout her amended complaint. (*See* Am. Compl., ECF 9, at ¶¶ 76–116, 157–58).

Police Board of Inquiry reasoned that there was no written policy regarding detention of witnesses. Thereafter, on May 29, 2020, the PPD issued Philadelphia Police Directive 5.23 which "provide[d] clear and concise standards and procedures for conducting interviews and interrogations by members of the [PPD] to safeguard the constitutional rights of all individuals while ensuring the correct offenders are identified, arrested and prosecuted."

On May 13, 2021, Defendant Pitts told the *Philadelphia Inquirer* that he never received any formal training on investigating crimes or interrogating suspects and he mostly learned how to do so "on the job."

Plaintiff alleges that in March of 2022, Defendant Pitts was removed from the homicide unit.

**LEGAL STANDARD**

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court "must accept all of the complaint's well-pleaded facts as true but may disregard any legal conclusions." *Fowler*, 578 F.3d at 210–11. The court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The complaint must do more than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Id.* (internal quotation marks and citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* To survive a motion to dismiss under Rule 12(b)(6), "a plaintiff must allege facts sufficient to

'nudge his or her claims across the line from conceivable to plausible.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).

**DISCUSSION**

As noted, Plaintiff asserts § 1983 civil rights claims against Defendants Jenkins and Glenn as well as state law claims based on their participation in the malicious prosecution of her for a murder that was knowingly premised on their fabricated evidence, (Counts I, III–VI, XIV). Additionally, Plaintiff asserts *Monell* claims against the City based on its customs and/or policies of facilitating and condoning various unlawful conduct, including the suppression of exculpatory evidence in violation of *Brady*/*Giglio*, and its failure to train, discipline, or supervise its police departments, (Counts VIII–XIII).

The City moves to dismiss all of the *Monell* claims, arguing primarily that Plaintiff does not meet the elements of her alleged failure to train, discipline, and supervise claims. Defendants Jenkins and Glenn move to dismiss Plaintiff's state law malicious prosecution claim (Count XIV) as duplicative of Plaintiff's federal malicious prosecution claim (Count I). Each of Defendants' challenges is addressed below.

### *Plaintiff's Monell Claims Against the City*

Under the principle of *respondeat superior*, a governmental entity may not be held liable under § 1983 for constitutional violations caused solely by its employees or agents. *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Rather, a municipality may only be held liable under § 1983 for monetary, declaratory, or injunctive relief where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. *Id.* at 694. Thus, liability may be imposed on a municipality *only* where its official policy or custom "causes" an employee to violate

another person's constitutional rights.  *Id.*; *see also Brown v. Sch. Dist. of Phila.*, 456 F. App'x 88, 90 (3d Cir. 2011) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010)).

### a. Plaintiff's Failure to Train Claim (Count VIII)

At Count VIII of the amended complaint, Plaintiff asserts a failure to train claim against the City premised on the City's failure "to have basic guidelines and training in place for homicide investigations," that "made possible and facilitated" Defendants Pitts' fabrication of a statement Plaintiff was forced to sign without the consent of her parents.  (Am. Compl., ECF 9, at ¶ 150). The City moves to dismiss this failure to train claim on the grounds that Plaintiff's allegations are "insufficient" because she only cites two incidents to support the requisite pattern and practice which are "untethered from theories of failure to train."  This Court disagrees.

A municipality's failure to adequately train its officers, agents, and employees may give rise to a cause of action under § 1983, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).  However, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  Indeed, the United States Court of Appeals for the Third Circuit has held that "[e]stablishing municipal liability on a failure to train claim under § 1983 is difficult."  *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).  To meet the deliberate indifference standard, a municipality's failure to train must reflect "a 'deliberate' or 'conscious' choice" made by municipal policymakers and must be the cause of the alleged constitutional violation.  *Harris*, 489 U.S. at 379.  "Plaintiffs can plead such deliberate indifference by alleging that decision-makers knew that similar constitutional deprivations had previously occurred and were aware of ways to prevent them, 'but either deliberately chose not to pursue such alternatives or acquiesced in a long-standing policy or custom of inaction in this regard.'"  *Onyiah v. City of Phila.*, 660 F. Supp. 3d

407, 417 (E.D. Pa. 2023) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996)). Generally, inadequate training can only amount to the requisite deliberate indifference "where the failure to train has caused a pattern of violations." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).

In arguing that Plaintiff has failed to allege a *Monell* failure to train claim, the City attempts to paint a picture of Plaintiff's amended complaint as devoid of any allegations of known, similar constitutional violations. This picture, however, defies reality as Plaintiff's amended complaint includes multiple instances of similar conduct which more than demonstrates a pattern of constitutional violations. Notably, in its motion, the City admits that Plaintiff has alleged two other incidents unrelated to her own in which Defendant Pitts and another police officer on separate occasions unlawfully detained suspects and witnesses in interrogation rooms for days. (Defs'. Mot., ECF 12, at p. 10). Plaintiff also provides numerous examples of other detectives' similar constitutional violations in interrogation settings in her amended complaint.[7] (*See* Am. Compl., ECF 9, at ¶¶ 90–93, 98, 101–03, 107–08, 110–16, 157–58). These facts are sufficient to allege the requisite pattern or practice for a failure to train claim because all of these incidents are similar to Plaintiff's allegations that she was unlawfully interrogated by Defendants Glenn and Pitts and forced to sign a fabricated statement. *See Giannopoulos v. Delaware Cnty., et al.*, No. Civ. 22-cv-2075 (E.D. Pa. Oct. 27, 2022) (holding that plaintiff alleged pattern of violations where he alleged "other incidents and lawsuit purportedly similar to those underlying [p]laintiff's claims"). As such, the City's motion to dismiss Plaintiff's *Monell* failure to train claim at Count VIII is denied.

---

[7]   For example, Plaintiff alleges that in 2008, Defendant Pitts and other detectives "threatened a deaf man and coerced him into signing a false statement by slamming his head into a wall." (Am. Compl., ECF 9, at ¶ 92). And in 2011, a minor testified at a preliminary hearing that Defendant Jenkins and another detective "took him from juvenile court to the [h]omicide unit in handcuffs, and interrogated him for at least eight hours before coercing him into signing a fabricated statement." (*Id.* at ¶ 108).

### b. *Failure to Discipline Claim (Count IX)*

At Count IX of the amended complaint, Plaintiff asserts a failure to discipline claim premised on the City's "failure to correct its woefully inadequate disciplinary system." (Am. Compl., ECF 9, at ¶ 165). "Failure[]to[]discipline claims, like failure[]to[]train claims, are 'generally considered a subcategory of municipal policy or practice liability.'" *Kirksey v. Ross*, 372 F. Supp. 3d 256, 265 (E.D. Pa. 2019) (quoting *Buonadonna v. Se. Delco Sch. Dist.*, 2015 WL 2365629, at *7 (E.D. Pa. May 18, 2015)). A failure to discipline claim "can only form the basis for section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997)). The City moves to dismiss Plaintiff's failure to discipline claim at Count IX on the grounds that Plaintiff has failed to allege that any policymaker was aware of the PPD's inadequate disciplinary system and failed to address it. The City is mistaken.

Plaintiff specifically alleges that "[a]t the time of [her] arrest, [t]he Commissioner of the PPD, the other executive staff of the PPD, the Mayor, and City Council all knew about the aforementioned failures of the disciplinary system, and more importantly, [the City's] conscious and affirmative choice to do absolutely nothing about it." (*Id.* at ¶ 138). Defendant does not challenge any of the named persons/entities' "status as policymakers." *See Simpson v. Ferry*, 202 F. Supp. 3d 444, 448 & n.1 (E.D. Pa. 2016) (finding that when plaintiff had named former police commissioner and mayor as policymakers, defendant had not challenged their "status as policymakers for purposes of *Monell* liability"). As such, accepting Plaintiff's allegations as true

at this stage of litigation, as the Court must, Plaintiff has alleged facts sufficient to impute knowledge to various policymakers. Accordingly, the City's motion to dismiss Count IX is denied.

### c. Failure to Supervise Claim (Count X)

At Count X of the amended complaint, Plaintiff asserts a failure to supervise claim, premised on the allegation that "[b]etween 2002 and Plaintiff's arrest [in 2010], dozens of people were physically abused, sexually abused, and held in isolation for days on end without access to necessities" by homicide detectives. (Am. Compl., ECF 9, at ¶ 196). Plaintiff alleges that this occurred within "feet of the offices of supervisors in charge of the homicide unit and . . . the executive staff of the PPD." (*Id.* at ¶ 199). The City moves to dismiss Count X on the grounds that Plaintiff does not identify how the supervision of the PPD's officers was inadequate or allege facts sufficient to demonstrate a causal link between the City's alleged failures and the deprivation of Plaintiff's rights.

To allege a viable failure to supervise claim, a plaintiff must "identify a specific supervisory practice that the defendant failed to employ," and allege facts sufficient to plausibly show "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval." *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 202 (3d Cir. 2000) (citation omitted). Here, Plaintiff baldly alleges an absence of "effective supervision," but fails to identify any supervisory practices, the absence of which caused her alleged injuries. As such, the City's motion to dismiss Count X is granted.

### d. Custom and Policy of Condoning and/or Acquiescing to Unconstitutional Investigatory Practices in the Homicide Unit Claim (Count XI)

At Count XI of the amended complaint, Plaintiff asserts a *Monell* claim premised on an allegation that the City had a "policy, practice[,] and custom . . . of condoning and/or acquiescing

in the very unconstitutional interrogation methods used on Plaintiff." (Am. Compl., ECF 9, at ¶ 204). The City moves to dismiss Count XI on the grounds that it is cumulative and redundant of Counts VIII through X. The City is mistaken.

Rule 8(d)(2) allows a plaintiff to "set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). Because this Court finds that Plaintiff's pleading is sufficient at Counts VIII and IX, Plaintiff's pleading at Count XI in the "alternative" is also sufficient under Rule 8. As such, the City's motion to dismiss is denied with respect to Count XI.

### e. Plaintiff's Brady/Giglio Claims (Counts XII–XIII)

At Counts XII and XIII of the amended complaint, Plaintiff asserts *Monell* claims against the Philadelphia District Attorney's Office and the PPD premised on an alleged policy, practice, and custom of intentionally withholding exculpatory evidence, in clear violation of *Brady*/*Giglio*. The City moves to dismiss these counts on the grounds that Plaintiff has failed to provide a nexus between the alleged policy and/or practice and the alleged constitutional violations.

In the amended complaint, Plaintiff alleges that, at the time of her trial, the District Attorney's Office and the PPD had documents evidencing, *inter alia*, that Defendant Pitts had made false statements to Internal Affairs Bureau investigators and police officers, "assault[ed] people, [and] fabricat[ed] false charges against innocent people" but that the District Attorney's Office and the PPD had "a policy, practice, and custom" of knowingly and intentionally suppressing this evidence "at the time of Plaintiff's arrest and trial," in violation of *Brady*/*Giglio*. (Am. Compl., ECF 9, at ¶¶ 220–24, 226, 230–32). Further, Plaintiff alleges that this policy of suppressing *Brady*/*Giglio* materials in criminal prosecutions led to Plaintiff's wrongful conviction and her spending over twelve years in prison. These facts, accepted as true at this stage of the

litigation, are sufficient to meet Plaintiff's pleading burden with respect to the requisite nexus. *See Alicea v. City of Phila.*, 2022 WL 17477143, at *6 (E.D. Pa. Dec. 6, 2022) (holding that plaintiff "allege[d] the necessary causation between the City's custom of knowledge and acquiescence and his own injuries" where he alleged that "the City permitted the PPD to violate rights by, for example, failing to turn over exculpatory evidence, the individual defendants failed to turn over evidence tending to show [plaintiff's] innocence, and [plaintiff] was wrongfully convicted in violation of his due process"). Accordingly, the City's motion to dismiss Counts VII and VIII is denied.

### *Plaintiff's Malicious Prosecution Claim Against Defendants Jenkins & Glenn (Count XIV)*

At Count XIV of the amended complaint, Plaintiff asserts a malicious prosecution claim against Defendants Pitts, Glenn, and Jenkins. Defendants Glenn and Jenkins move to dismiss this claim on the grounds that it is duplicative of Plaintiff's § 1983 malicious prosecution claim asserted against them and Defendant Pitts at Count I. Defendants Glenn and Jenkins are mistaken. As Plaintiff makes clear in her response to Defendants' motion to dismiss, Plaintiff's malicious prosecution claim at Count I is a ***federal*** malicious prosecution asserted under 42 U.S.C. § 1983 while Plaintiff's malicious prosecution claim at Count XIV is a ***state common law*** malicious prosecution claim. *See Thomas-Warner v. City of Phila.*, 2011 WL 6371898, at *11 (E.D. Pa. Dec. 20, 2011) (allowing plaintiff's state and federal malicious prosecution claims to proceed past motion to dismiss stage). In light of this distinction, Defendants' motion to dismiss Count XIV is denied.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted, *in part*, and denied, *in part*. Specifically, the motion to dismiss the claims against the City at Counts VIII, IX, XI, XII,

and XIII is denied; while the motion to dismiss Count X is granted. With respect to Plaintiff's claims against Defendants Jenkins and Glenn, the motion to dismiss Count XIV is denied. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.